Call Case Number 258024, 4B Properties v. The Nature Conservancy. Good morning, Your Honors. Carolyn Gerland and together with my co-counsel, Lauren Haffenhausen, on behalf of 4B Properties and Gary Benning, we ask you to reverse the district court's grant of summary judgment in this case. This is a case with a long procedural history and a dense fact background, but in the context of the district court's grant of summary judgment, the operative facts and legal standard are straightforward. Two witnesses, Mr. Benning and his now wife, Mrs. Benning, provided consistent sworn testimony about the promise that is the subject of the promissory estoppel claim in this case. That promise concerned what Mr. Benning was allowed to build with respect to a secondary structure on his property. That consistent testimony was that then Wyoming State Director Haley Mortimer promised the Bennings that he could build a structure as long as he did not call it a guest house, did not put a kitchen in it, and it was consistent with the Teton County LDRs. Ms. Mortimer has not refuted that testimony. She was the only other participant in this meeting. That is the baseline promise that we have discussed in our briefs. Notwithstanding that, your honors, the district court concluded that Mr. Benning and by implication Mrs. Benning had simply fabricated this testimony in order to manufacture a claim in this case. The district court in order to reach that conclusion made numerous factual inferences against the Bennings who are the non-movements. There were no, there was no evidence that blatantly contradicted the Bennings testimony and that type of real contradiction is what would have been required in order for the district court to do what it did and absolutely reject the Bennings testimony. Well, let's just assume that what the Bennings testified about the conversation over that lunch, let's just assume that those statements were made by Ms. Mortimer. As you began your presentation, you said this case has had a long history. How do we view the long history of negotiations of the exchange of letters of the litigation with this one lunch meeting and our assessment as to whether or not those statements presented a clear and definite promise? Thank you, your honor. Yes, I think that the history is important because when Ms. Mortimer showed up at the luncheon, she was the brand new state director of Wyoming TNC and she had recognized as she said at the luncheon that she felt sorry about what had happened in the past, that the TNC had been inconsistent with Mr. Benning and the way that it had treated him. She noted that the Wyoming Supreme Court opinion itself noted that the TNC had been inconsistent with Mr. Benning and Ms. Mortimer said at that luncheon, I don't want there to be any more litigation. I want to solve this, but I need to solve it in the context of the Wyoming Supreme Court opinion. I have to comply with the Wyoming Supreme Court opinion and I have to find a solution that comports with the Wyoming Supreme Court opinion. She did express regret at what had happened to Mr. Benning in the past and said she wanted there not to be more litigation and that is what led to her promise and the promise seems odd unless one really knows the intricacies of the Teton LDRs and of the Wyoming Supreme Court opinion because what this really kind of brilliant promise from Ms. Mortimer did was it threaded the needle precisely and allowed her to promise Mr. Benning that he could do, he could be within the technical requirements of the Wyoming Supreme Court opinion, still get not all of what he wanted, but a portion of what he wanted, which was that he could have a secondary structure that had multiple purposes, meetings, exercise, whatnot, and also to be as long as that structure didn't have a kitchen and that was because the Wyoming Supreme Court opinion focused on what was a residence and under the Wyoming LDRs, a structure cannot be a residence or dwelling unless it has a full kitchen and then again, they get into some pretty nitty gritty detail talking about a stove. It has to have a hookup, could be natural gas. If it's voltage, it's got to be 220 volts. Counsel, can I cut you off? I apologize, but at that point, Mr. Benning of course also knows that he has been to the Wyoming Supreme Court and lost and that his communications with the Nature Conservancy have been more formal. There have been again, letters authored by counsel and as you just said, Ms. Mortimer, she's new to all of this and she came in as I understand it, seeking to avoid litigation. And so Mr. Benning has this conversation. He walks away. How can we conclude that he, at that point, it was reasonable to rely upon what was, he deemed a clear and definite promise when thereafter they don't just start building immediately. And more importantly, he is insistent that everything needs to be done in writing as to this promise, which makes sense because he's been litigating against them on this very issue for years. Well, starting at the beginning, how we know that it's a clear and definite promise is that the promise itself had every single term that the architects needed and they knew exactly what they were able to design. But what about the fact that Ms. Mortimer, everyone agrees that at the end of it, she said, yeah, I need to take this. He wanted it in writing. And she said, yeah, I got to take this back to my legal counsel. I got to take this back to my staff. I got to talk to them about it. That all by itself says this is not a, a clear and definite promise. This is something we've talked about, but we're still in the negotiation stage. I'm not done. I of course have to take this to my legal counsel. What about that says, Oh, we're done. I can go forward on this because I got a clear promise. Oh. And he also said, yes, I want it in writing. And then it doesn't never put into writing and he doesn't push on that. Yes, Your Honor. And what is put in writing is nothing about what they talked about. And he doesn't push on that. All of these facts would lead any reasonable person to believe there was certainly no clear and definite. There might've been a clear one, but it wasn't definite. So she said, I got to talk to my legal counsel. And he said, we need to put this in writing. And that didn't happen. Thank you, Your Honor. And I think this is the central issue and a very important issue. Um, and it only works if we refuse to make the inference in favor of Mr. Binning as we're required to at this phase of the proceeding. Well, you can make inferences, but you can't change the facts, which are undisputed, which is, she said, I still got to talk to my legal counsel. I'm not, you know, basically we're not done. About, she needed to talk to her legal counsel about the attempted compromise, not about the baseline promise. So I think that. Well, how, what, I mean, is that disputed? It is absolutely disputed. What she said she needed to talk. Did she say, we got a done deal here. I'm just going to talk to my legal counsel for, for what purpose? Your Honor, she was going to talk to her legal counsel only in the context of the attempted compromise, which was to get more than the baseline promise. The baseline promise is clear on its terms when they're talking about what more do I have to talk to other people about it? Should we have a writing? All of that concerns another promise, a second promise that never came to fruition. Okay. So she was solid and on the baseline promise. On the baseline promise. That is the testimony. And then he said, I want whatever we agreed to be in writing. And that never happened. And in fact, something else gets put into writing. And he doesn't say, Hey, that's not the baseline promise. That's not. We agree, but we agreed to. The interesting thing about that when it, when it comes out and it comes out in the form of a writing September 11, 2020 letter. And what it starts with is that it says we understand that you want to have two residences. And what that means under the very specific facts of this case is we understand that you want to have two kitchens. So we know right there that what they're talking about is not the baseline promise. They're talking about the something more, the something that never came to fruition. How else do we know? Because when Mr. Binning was talking about, why are you continuing to negotiate with Ms. Mortimer? If you had already the baseline promise that you wanted, he said, boy, I really wanted to get a kitchen. So all of these additional discussions, the things that she needed to take back to her team, all of these other issues involve a completely separate discussion, which is what would have to happen in order for Mr. Binning also to get a kitchen. Isn't that a traditional negotiation of the details of whatever the agreement is eventually going to be? That's not, Oh, we have an agreement and we're going to move forward with this. It's a, we have these, this baseline, as you say, but we're not, we don't accept this baseline. I'm going to keep trying to get more. That's not a, that's not a definite agreement. It's a, we're not done negotiating yet. Mr. Binning did have a clear and definite agreement that he could do at least the minimum. He could at least have a structure, which was an unattached structure that didn't have a kitchen in it, as long as he didn't call it a guest house and it complied with the LDRs. That was what it was. And this would have been a much more simple case if there weren't additional discussions involving the more that Mr. Binning really wanted, which was for there to also be a full kitchen in it. So this was unlike the cases cited in the, in the briefs, in TNC's briefs, this is unlike very much unlike the Woodward case in which it's a continuing negotiation with respect to one promise and there's an expectation of a writing it needs to be in writing. There's an integration clause, even saying that prior oral discussions are invalidated. This is not that case. This is a case in which there were two, there was a baseline promise, clear and definite when made. How do we know in all of the thousands of pages of email communications with the architects, never once is anyone at all ambivalent about what it is that they're building. They know exactly what it is that they're building. And there's even specific reference to the promise at the point in time that Mr. Binning in October of 2022 puts the plans in immediately before he has, he refers to this promise in an email to his architect, John Carney. And he says, well, I don't think that we should give the plans to TNC in advance, even if we don't have to. And I don't think there's going to be a problem because remember what the state director said to us in the directive that she gave to us. And then replete in the record, which the district court entirely ignored were numerous emails in which the architects talk about, well, we have to we have to put no kitchen in it to comply with TNC. They're talking about the promise. They're talking about the baseline promise. Everybody is clear with their designing. It is clear and definite when made and everybody proceeded exactly on that basis.  does the record also show that after that lunch meeting that Mr. Binning instructed his architects and their crew to pause work? He was pausing work. Yes, your honor. He did pause work as he was contemplating the, whether or not he could get the plus the kitchen. And that is the purpose for pausing. And 10 days after the conversation with Ms. Mortimer, he was back on track and designing a wellness center, not called the guest house without a kitchen in it. With that, I'd love to reserve. And I'm sorry that I didn't say that at the beginning. Thank you. May I please the court counsel Leah Schwartz on behalf of the nature conservancy. This appeal involves the summary judgment disposition of just one claim about a single promise allegedly made over lunch. Considering the legal context, what was allegedly said at the lunch, the written followup and what the binnings did after the claim was properly disposed of on summary judgment. This appeal does not involve questions of credibility or he said, she said, and that's because even if we accept every thing that the binnings say occurred at the lunch as true, this claim still fails under well-established Wyoming law and it fails at every element. I would like to spend a little time at the beginning, just talking about the context that justice Fredericko mentioned at the outset. Um, the cases say that this context necessarily informs the first two elements of a promissory estoppel claim. What could the alleged promissor reasonably expect front by their words and what could the hearer, the alleged promisee reasonably do in reliance on them. The Davis v. Davis case is instructive. It says the nature of the transaction is significant. What's at stake is significant. Roth v. First Security. That case discusses the sophistication of the parties and how, when the conversation occurs and how in their course of conduct and in dealings with each other. In both of those cases, the promissory estoppel claims were dismissed on summary judgment. So here we have a conservation easement governing the relationship between these parties. This Wyoming Supreme Court does a good job, Your Honors, of explaining what a conservation easement is. Um, I think it's important to just touch on the fact that it is not like a business contract where we might expect people to sit around the table and haggle over terms, maybe change them. This is a real property interest. It's a perpetual real property interest. The courts have described it as quasi contractual in nature in terms of how it's interpreted. But commentators also describe conservation easements as a charitable trust. And that's because when they are granted, they serve a public good, a conservation purpose. They are subsidized by the public in the form of the tax write-off that the grantor receives at the outset and in the form of reduced property taxes throughout the duration of the property. Um, TNC is not a party to the conservation easement in the same way we think of parties to a contract. It is a holder of the conservation easement that has certain obligations to uphold and enforce its terms consistent with the intent of the settler or the grantor. In this case, that was Gladys Moulton, a long time, old time Wyoming rancher, um, and conservationist in the Jackson Hole Valley. Um, so these obligations set the framework for what we're talking about here. Um, fiduciary in nature. In this context, the Wyoming Supreme Court says conservation easements should be protected against expedient exemptions with which defeat the purpose of preserving land in its natural state. We also have the prior litigation here. So we have a Supreme Court opinion interpreting this conservation easement. The court can read what the, this court can read what the Wyoming Supreme Court said, just as Mr. You do have, but then you have Ms. Ms. Mortimer seemingly almost trying to go around the Wyoming Supreme Court's opinion to make something work, which certainly wasn't necessary for her to do, but that did seem to be the nature of the lunchtime meeting was,  yeah, we were kind of stuck. Now you've got this, this, you have this litigation and this was the result and they said no. So, hmm, where to now? Where to now? That's right. The allegations described the lunch as a discussion of possibilities that the detached, um, the kitchen list structure, uh, quote unquote promise was a concept. So that was the framework. Um, but prior to that lunch, Mr. Binning had received multiple letters from TNC in-house counsel, Ms. Mortimer herself saying we cannot approve a guest house on this property. We are compelled by law to adhere to the Wyoming Supreme Court's decision. This was reiterated that lunch, according to Mr. Binning's own testimony. So we can think about the Wyoming Supreme Court opinion in a way as an additional condition or term of the promise in this case. He testified what she was concerned about was that TNC complied with the Supreme Court ruling, which says you can't have a guest house. She was very emphatic that,  we needed to comply with the Supreme Court ruling. That's at R 1763. So that is a part of the framework for the party's discussion. We also know that there was an ongoing dispute about the litigation. This was not a,  case closed. Let's move forward. Everyone wash our hands here. This was Mr. Binning testifying that he was contemplating renewed litigation against TNC before the parties even sat down to that table. Yeah, but isn't that important for the context? If Mr. Binning walks away from that lunch and he knows that he's essentially threatened to sue again and Ms. Mortimer, my understanding is is the new relatively new president of TNC in Wyoming and she comes to lunch and says we want to end hostilities, right? And we want to avoid litigation. So let's figure out a way to get around it. I mean, doesn't that context matter too? And kind of at least lean towards Ms. Binning saying, well, that was her intent for coming to lunch and she's told me how I can do it. And your opposing counsel just said that Ms. Mortimer was solid on that baseline promise. Why couldn't he rely on that? Well, because your honors, he read the Wyoming Supreme Court decision. He had access to the conservation easement. He also testified contrary to the argument of counsel that he, did not trust TNC to honor its commitments even as of August of 2020. Counsel at during Mr. Binning's deposition put him under questioning for some period of time, tried to clarify that, oh, didn't this feeling of wanting to sue change after you talked to Ms. Mortimer? But he testified he was always prepared for litigation against the Nature Conservancy. Um, we of course reject the Binning's characterization of TNC's behavior and why he was distrustful of the organization. But the point is there was a standing dispute going into that lunch and a significant disagreement about the legal baseline from which the parties were operating. But, but they say that the two, Mr. and Mrs. Binning say there was this agreement, this baseline agreement. Uh, and, and does Ms. Mortimer say she didn't basically suggest this workaround of the Supreme court, which is how I viewed it. She was never asked that during her deposition, your honor. Um, so she did not directly correct. We have nothing to controvert that there was a baseline agreement. Well, the testimony did not this, this notion of a baseline agreement that only emerges in the party's briefing. Um, the discussion, the testimony was about a discussion of options.  Um, and you know, the stakes were high at this juncture, the parties that spent a lot of time and money on the prior litigation. Um, the stakes were high for the organization for some of the reasons I mentioned organizational integrity, upholding the law and the judicially determined intent of the easement grant tour. But the stakes for the binnings were high too, because they say they really wanted a structure for their guests that was vital to them. And so we need clarity around that term that is so vital. The court recognized that in the Brown v. McAbee's case, this, this court, that when a term is so vital, you need that to be adequately described. Um, the claim in this case is for over $11 million in damages because the structure was so important to them. They said they couldn't build any part of their, their plan without it. So that's the kind of clarity we need. This is high stakes. Um, he testified also that he was thinking of selling his adjacent property ranch 10. So he wanted something to show a future buyer to say, this is what you can build in addition or to supplement the conservation easement, which is in the land records. So it is undisputed that this was a sophisticated businessman looking to preserve his optionality. He had lawyers in the wings. Um, and again, this is a discussion of option options. This frames the Nate, the discussion. But even if we were to ignore all that, your honors, and just look myopically at what was allegedly said at the lunch, this claim fails for lack of clarity. And it fails for lack of finality, which are two very important elements and you know, discussed at length and when case law, um, talking about the followup writing, there's been again, argument of counsel. This is argument of counsel, not evidence, but argument of counsel that,  well, all he was really expecting or wanting was a written commitment as to one of the options. Um, and further follow up as to one of the options, but the actual promise did not require written followup, um, among the options discussed. Well, the testimony as a judge Moritz has referred to was that Mr. Binning actually wanted whatever she agreed to at the meeting in writing that your honors is at our one seven,  one, uh, also our one seven, eight, eight. I wanted something in writing that if we decide to sell ranch 10, we had certainty. You can build this, whatever this is record one, seven, eight, nine question to the witness, but whatever the position was, you needed it in writing to give you clarity as to both structures, correct response. We would like a writing because that makes it clear. Counsel, in terms of the record to the district court determined that the really only promise that was made was a letter of September 11th. It was clear and definite. And do you agree with that finding? It's an interesting question,  Of course, that wasn't actually the issue before us on summary judgment. Um, we note that the letter that's copied in our brief, which counsel actually misrepresents, it does not reference a desire for two residences, uh, at all. It's set forth on page 12 of our brief. But, um, that letter expressly States that even the approval of one structure, again, this is just for one structure. So this wouldn't even implicate the associated improvements question, which had been so hotly litigated all the way up to the Wyoming Supreme court. Even that would be subject to a review of plans and the nature conservancy announced. We believe it's required under the conservation easement that you submit plans to us. It's not, it's undisputed that there were no specific plans discussed at the lunch. It's undisputed. The term wellness center was not discussed at the lunch. This again was in the context of possibilities need for followup advice. That's the record. One seven, seven, two, Mr. Binning's own words. She needed some advice. He was, he recognized that. Um, I would also point your honors to the followup email correspondence around this issue because it is just really overwhelming on this point. Uh, our three one to one talking about thinking about possibilities and next steps. Uh, it was so nice to meet you. Um, record two Oh three, six. We're still working on the letter. Um, the letter you have requested record two Oh three eight key members of our council are not available this week to review the draft letter record two Oh four Oh from Mr. Binning. Should we still expect a letter response? We just finished another round of discussions. So in the same way that in cases like Bert V Wells Fargo and the black card case, the promise was described as precatory. It was not final or firm in this case either. Um, when the letter did finally come, your honors, I would also note that the transmittal email is titled subject clarification letter. That's at our two Oh four three. So whatever Mr. Binning, you may have heard at the Pines lunch, this letter objectively communicated he and the nature conservancy were not on the same, same page about what he was proposing to build. Um, and um, the Woodward case is on point while that case did involve a subsequent contract. Judge Johnson in that case observed that it didn't much matter. What matters is that the plaintiff saw the writing did not match the terms of the agreement. They suffered a financial loss but not due to reasonable reliance. Your honors, I'm nearly out of time, but I would also just point the court to the many conditions attached to this promise. You know, comply with the Wyoming Supreme Court opinion, comply with the LDRs. It can't have a kitchen. Oh, but we must imply that it can't have a kitchen under a technical definition that was undisputedly not discussed at the meeting. The testimony was that no specific LDR sections or definitions were discussed. That is our R1763 and the promise on top of all of that evolved dramatically over the course of the case. The initial complaint discussed a 2,500 square foot structure and that was undisputed and set out in our statement of material facts in the case. And yet what we see submitted is a 27,000 or 2,700 square foot. Structure. Again, your honors, many basis to affirm. We respectfully respectfully ask the court to do that. This is just the type of case rule 56 is designed to see disposed of on summary judgment. If there are no further questions, I can sit down. Thank you. Thank you very much. Rebuttal. Can you add 50 seconds to her rebuttal? I'm sorry. I'm looking over here like, sorry, Amy, can you add 50 seconds? Thank you,  So clarity and finality. Here's what Mr and Mrs Benning testified that the promise was go ahead and build it. Just don't call it a guest house. Don't put a kitchen in it and make sure that it complies with the LDRs. That is a promise that was complete and it was complete when made and it provided all of the direction that the architects needed in order to do exactly. If that was the promise, if that was the promise and that's what of course you're saying he and Mrs Benning alleged, wouldn't you think that when this letter was sent in September by the Nature Conservancy talking about something entirely different, which was a structure, a residential structure that consists of separate wings connected in the same manner. That's not the baseline promise anymore, is it? That is not the baseline promise. And I'm glad you asked your honor. And I'm glad you added that. And then this gets presented, it gets presented to your client. Yeah. That that's a residential structure. And I think that that's so important, the word residential. Could you stop please?  my question is instead of saying this isn't the baseline promise, why are you now saying that this is what we might agree to? He takes a pen and suggests some corrections to it and he doesn't edit that out. Your honor, he wants a kitchen. The reason. That's not, that's not my question. I know he wants a kitchen. I'm saying if what you have been saying is the absolute fact that there was a baseline promise that nobody's ever going back on, when she writes a letter and puts it in writing, which he's been wanting, here's, here's what we're willing to do. Here's the new deal. He doesn't say, Oh no, no, no, no. That's not the baseline promise. In fact, it's different. Uh, he makes little edits, which he doesn't accept. But the point being never ever again is the base, this baseline promise referred to, and apparently it wasn't called that at the time, but do you see what I'm saying? I do see what you're saying. I'm not asking about the kitchen. I'm not asking about what he wants. I'm asking about his actions in response to the writing that he wanted. And I think that the question of whether or not he didn't demand a more specific writing, I think this is an excellent, excellent fact question, but it is a fact question and not the type of thing that should be resolved on summary. No, because the question is, was there a clear and definite agreement? And the fact that he responded by not talking about the clear and definite agreement is evidence. There was no clear and definite agreement. However, the clear and definite agreement that what was being discussed was a separate attempt toward a different agreement, which would have gotten him the ability to have the kitchen. I think that an important aspect of this residence dwelling kitchen component is that, is that for, for something to be a dwelling or a residence under Wyoming Supreme Court law, it has to have a kitchen. And so why there didn't need to be a writing for the baseline promise is because with respect to the baseline promise, Ms. Mortimer was giving him a workaround that didn't have, that, that he didn't have to, they did not have to vary from the Wyoming Supreme Court opinion, nor they had to vary from the Teton County LDRs. Everything that she said in this technical workaround that she provided in order to avoid additional litigation was permitted under the law, was permitted under the regulations. What he was asking for it with a separate writing that was the September 11 writing was for something plus something more. And for that there would needed to have been a writing because that would have been a variation from the Wyoming Supreme Court opinion. When Ms. Mortimer, go ahead please. Counsel, you, if I understand you correctly, you're saying that because Ms. Mortimer invoked the LDRs that your, your client had sufficient clarity to move forward. How are the LDRs even relevant when the, when the Wyoming Supreme Court specifically said that's not, that's not the interpretation of the, of the easement and they, they did not rely on them and they, they interpreted the easement differently. The Wyoming Supreme Court opinion said you can only have one residence. You can't have more than one residence. And what, and so in order, but under the LDRs in order for something to be a residence, it has to have a full kitchen. And so what Mr. Binning designed when, when his architects designed a wellness center that didn't have a full kitchen that was fully compliant with the Wyoming Supreme Court opinion. And indeed was approved by Teton County as a structure that was not a dwelling and not a residence. So you would not agree that the Wyoming Supreme Court opinion and the LDRs are in tension with one another. I don't think that they are in tension with one another. No, Your Honor. I think that the LDRs inform the Wyoming Supreme Court's discussion, which is that you can have one dwelling, you can have one residence, you can't have two. Well, what makes something a dwelling or a residence? It's whether or not it has a kitchen. And of course this is a hyper-technical reading, but you know, it's, it's Ms. Mortimer's hyper-technical reading. It was not Mr. Binning's hyper-technical reading. And I submit that she provided this hyper-technical reading of what you can do because she wanted to avoid exactly a situation in which we're standing here litigating more. She told him what he could do to thread the needle very technically and comply with the Wyoming Supreme Court opinion, not run afoul of that, not need to dissolve anyone. Counselor, you're out of time. Is there any further questions? Any? Okay. Thank you. Thank you. All right. Thank you, counsel, both for your arguments. They've been very helpful. Um, case will be submitted and counsel are excused.